NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-1980
_____

*INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES,
Moving Picture Technicians, Artists and Allied Crafts of the
United States, its territories and Canada (IATSE) Local 8,
                                                            Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
                                                            Respondent

(*Amended Per Clerk Order of 06/03/20)

_____

No. 20-2199
_____

NATIONAL LABOR RELATIONS BOARD,
                                                            Petitioner

v.

INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES,
Moving Picture Technicians, Artists and Allied Crafts of the
United States, its territories and Canada (IATSE) Local 8,
                                                            Respondent

_____

on Petition for Review and Cross Application for Enforcement
of an Order of the National Labor Relations Board
(NLRB Docket Nos. 04-CB-216541 and 04-CB-221871)
_____

Before:  HARDIMAN, MATEY, and SCIRICA, *Circuit Judges*.

(Filed: January 20, 2022)

_____

OPINION[*]
_____

**SCIRICA**, *Circuit Judge*

Petitioner International Alliance of Theatrical Stage Employees, Moving Picture

Technicians, Artists and Allied Crafts of the United States, its Territories, and Canada

(IATSE) Local 8 (the "Union") petitions for review of an Order issued by the National

Labor Relations Board (the "Board") finding the Union violated the National Labor

Relations Act (the "Act"), 29 U.S.C. § 158(b)(1)(A), by reassigning Martin McIntyre

from the house crew at the Philadelphia Convention Center ("PCC") and by filing

internal union charges against him.  The Board cross-applies for enforcement of that

Order.  We will deny the petition for review and grant the cross-application for

enforcement.

I.

The Union is a labor organization within the meaning of Section 2(5) of the Act.

It represents employees who work at several locations, including the PCC, where it

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

operates an exclusive hiring hall. Contractors request labor at the PCC by submitting a labor order form to Elliott-Lewis, a staffing agency for contractors working at the PCC, which then obtains workers from the Union. Notably, self-soliciting work from these contractors violates the Union's Constitution. "The Union's agreement with Elliott-Lewis permits the Union to designate some employees as members of a 'house crew' that has priority in obtaining work at the PCC over other union members. If more employees are needed at the PCC than are on the house crew, the Union refers them through its PCC hiring hall." Respondent's Br. 4.

According to the Union, in 2014, the house crew consisted of ten members, plus Axel Barnes ("Barnes"), the nephew of Union President Michael Barnes ("President Barnes"). Barnes served as a general foreman and union steward. In 2015, the Union membership voted to increase the house crew to fifteen members. By September 2016, the house crew expanded to eighteen members, plus Barnes. Martin McIntyre, who became a union member in 2002, joined the house crew in September 2016 as the eighteenth member.

While serving on the house crew, McIntyre had several disagreements with the Union's leadership. McIntyre repeatedly questioned the authority of the PCC general foreman and complained to the foreman about staffing decisions. On September 19, 2017, "President Barnes sent McIntyre an email threatening to replace him on the house crew if he continued to complain." Respondent's Br. 5. The email stated:

> Please be informed the seniority for the House Crew at the convention center is based on building seniority not industry seniority. This was explained to you when the job was offered. You may recall the job was

3

offered to you on the condition you did not disrupt the stability of the crew. If this issue persist (sic), you will be replaced on the house crew.

JA 379. Despite receiving this email, "McIntyre continued to question job assignments at the PCC." Respondent's Br. 5.

On March 5, 2018, McIntyre learned he had been removed from a job at the PCC. "McIntyre immediately sent text messages complaining about the work assignment to Axel Barnes and two members of the Union's Executive Board." Respondent's Br. 6. The next day, "President Barnes sent McIntyre an email removing him from the house crew." *Id.* President Barnes "attached his September 19, 2017 email threatening to remove McIntyre from the house crew if he continued to complain about work assignments," *id.*, and wrote, "[b]ased on additional information reported to this office after this email was sent, you are being removed from the house crew at the [PCC]." JA388. McIntyre requested that President Barnes reconsider, but President Barnes did not respond.

"McIntyre filed an unfair-labor-practice charge with the Board on March 14, 2018, and an amended charge on April 25. . . . [H]e alleged that the Union had removed him from the house crew for complaining about the Union's failure to follow its seniority list [when] referring members to various jobs. On April 30, President Barnes filed two internal union charges against McIntyre for alleged violations of the Union's Constitution and By-Laws." Respondent's Br. 7 (citations omitted). The first charge alleged McIntyre filed charges with the Board before exhausting internal remedies. The second

4

charge alleged McIntyre solicited referral jobs outside of the hiring hall procedure. On May 31, the Union dropped both charges against McIntyre without explanation.[1]

The case was tried before the Administrative Law Judge on January 31, 2019. The Union contended McIntyre was reassigned to conform to the Union's membership vote setting the number of members in the house crew to fifteen. According to the Union, McIntyre was chosen for reassignment because he was the least senior member of the house crew, was unwilling to serve as a lead or foreman, and attempted to self-solicit work in violation of the Union Constitution. The ALJ issued a decision on March 11, 2019, holding the Union violated the Act. Specifically, the ALJ found that the Union's purported "reduction in force" reason was pretextual and the Union violated Section 8(b)(1)(A) of the Act by removing McIntyre from the house crew for questioning work assignments. Moreover, the ALJ held the Union violated Section 8(b)(1)(A) by bringing internal union charges against McIntyre for filing unfair labor practice charges with the Board. On April 29, 2020, the Board issued its Decision and Order, affirming the ALJ's rulings, with one Board member dissenting.

The Union challenges the Board's Order that it violated Section 8(b)(1)(A) of the Act by reassigning McIntyre from the house crew to the regular crew.[2] The Union

---

[1] On June 6, 2018, Joseph Baliski, the Union's recording secretary, filed another internal union charge against McIntyre, accusing him of leaving work early on May 2, 2018. McIntyre was told he would have to appear before the Union's Executive Board as a result of the May 2 incident because he already had union charges pending against him, despite those charges being subsequently withdrawn.

[2] The Union does not challenge the Board's finding that it violated Section 8(b)(1)(A) of the Act by filing internal union charges against McIntyre for filing unfair labor practice charges against the Union. Accordingly, we accept the Board's finding as true. *NLRB v. Konig*, 79 F.3d 354, 356 n.1 (3d Cir. 1996).

contends the Board erred because McIntyre was reassigned for legitimate, non-discriminatory reasons.

## II.[3]

We "exercise plenary review over questions of law and the Board's application of legal precepts." *Coral Harbor Rehab. & Nursing Ctr. v. NLRB*, 945 F.3d 763, 767 (3d Cir. 2019) (citation and quotation omitted). We review the Board's factual findings under the substantial evidence standard. 29 U.S.C. § 160(e), (f); *NLRB v. ImageFIRST Unif. Rental Serv., Inc.*, 910 F.3d 725, 732 (3d Cir. 2018). The substantial evidence standard is satisfied where there is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *ImageFIRST Unif. Rental Serv., Inc.*, 910 F.3d at 732. We may not displace the Board's choice between two conflicting views, even if we would have made a different choice had we reviewed the matter de novo. *Quick v. NLRB*, 245 F.3d 231, 240 (3d Cir. 2001). Accordingly, we defer to the Board's credibility determinations and only reverse them "if they are 'inherently incredible or patently unreasonable.'" *Grane Health Care v. NLRB*, 712 F.3d 145, 149 (3d Cir. 2013) (quoting *St. George Warehouse, Inc. v. NLRB*, 420 F.3d 294, 298 (3d Cir. 2005)).

## III.

A union owes its members a duty of fair representation. *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991). A union violates this duty if it treats an employee in a

---

[3] The Board properly exercised jurisdiction over the unfair labor practices action under 29 U.S.C. § 160(a). We have jurisdiction to review the Board's final order pursuant to 29 U.S.C. § 160(f), and to consider the application for enforcement pursuant to 29 U.S.C. § 160(e).

manner that is arbitrary, discriminatory, or in bad faith. *Id.* Section 8(b)(1)(A) prohibits a labor organization from restraining or coercing employees in the exercise of their rights guaranteed by Section 7 of the Act. 29 U.S.C. § 158(b)(1)(A); *see also Breininger v. Sheet Metal Workers Int'l Ass'n Loc. 6*, 493 U.S. 67, 73 n.2 (1989). This prohibition extends to the operation of an exclusive hiring hall, which is "held to a higher standard of fair dealing" because of its potential coerciveness. *Boilermakers Loc. No. 374 v. NLRB*, 852 F.2d 1353, 1358 (D.C. Cir. 1988); *see also Breininger*, 493 U.S. at 89 ("[I]f a union does wield additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly *increases* rather than *decreases*.").

In the exclusive hiring hall context, if a union "causes a worker to be fired or [] prevents a worker from being hired," a rebuttable presumption arises that the interference is intended to encourage union membership in violation of Section 8(b)(1)(A). *Lucas v. NLRB*, 333 F.3d 927, 934 (9th Cir. 2003); *see also Int'l Union of Operating Eng'rs, Loc. 18*, 204 N.L.R.B. 681, 681 (1973), *enforcement denied on other grounds*, 496 F.2d 1308 (6th Cir. 1974) ("When a union prevents an employee from being hired or causes an employee's discharge . . . we will . . . adopt a presumption that the effect of its action is to encourage union membership."). To overcome this presumption, a union must demonstrate that it "acted according to a valid union security clause or that the union's action was necessary to the effective performance of its function of representing its constituency." *Lucas*, 333 F.3d at 934 (cleaned up).

The Union interfered with McIntyre's employment status by reassigning him from the house crew and did not demonstrate its interference met the requirement necessary to

7

overcome the presumption against it. Although the Union contends McIntyre was reassigned for several reasons that do not violate the Act, the ALJ found that the reduction in force claim was pretextual and implicitly discredited the Union's claim that McIntyre was removed for self-solicitation. The Board agreed and explicitly found the Union's solicitation argument not credible.[4]

The Board's determination is supported by substantial evidence. Such evidence includes President Barnes' emails to McIntyre, the fact that the house crew was not reduced to fifteen people at the time McIntyre was reassigned, and President Barnes' admission that McIntyre's questioning of job assignments was a factor in his removal. And it is significant that, as the Board notes, the Union's claim that McIntyre was removed for soliciting work was never raised until the hearing with the ALJ. Because the Board was within its discretion to find the Union improperly removed McIntyre from the house crew, we will deny the petition for review.

IV.

For the foregoing reasons, we will deny the petition for review and grant the cross-application for enforcement.

---

[4] Petitioner contends the Board erred in concluding President Barnes's testimony that Axel Barnes told him McIntyre self-solicited work was hearsay. We agree with Petitioner that those statements were not hearsay, but that does not affect our conclusion. The Board explained that even if it considered this evidence, it would still have found that McIntyre was not removed for engaging in self-solicitation. We agree with the Board.

8